J-S10031-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.J.T.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2 MDA 2025 |

Appeal from the Decree Entered December 5, 2024
In the Court of Common Pleas of York County
Orphans' Court at No(s): 2024-0113a

| | | |
|---|---|---|
| IN RE: ADOPTION OF: J.M.T.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3 MDA 2025 |

Appeal from the Decree Entered December 5, 2024
In the Court of Common Pleas of York County
Orphans' Court at No(s): 2024-0114a

| | | |
|---|---|---|
| IN THE INTEREST OF: C.T.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M.T.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 4 MDA 2025 |

Appeal from the Order Entered December 5, 2024
In the Court of Common Pleas of York County
Juvenile Division at No(s): CP-67-DP-0000176-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: J.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |

:
APPEAL OF: J.M.T.R., MOTHER                 :
:
:
:
:
:
:                No. 5 MDA 2025

Appeal from the Order Entered December 5, 2024
In the Court of Common Pleas of York County
Juvenile Division at No(s):  CP-67-DP-0000175-2023

BEFORE:  BOWES, J., OLSON, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED MAY 13, 2025**

J.M.T.R. a/k/a J.R. ("Mother") appeals from the decrees involuntarily terminating her parental rights to her daughters, C.J.T.R. a/k/a C.T.R. (born in February 2022) and J.M.T.R. a/k/a J.T.[1] (born in November 2017) (collectively, "the Children"), and from the accompanying orders changing the Children's permanency goals to adoption.  We affirm the involuntary termination decrees and dismiss Mother's appeals from the goal change orders as moot.[2]

The factual and procedural history of this case is as follows.  The York County Office of Children, Youth & Families ("CYF" or "the Agency") obtained emergency protective custody of the Children in June 2023, due to allegations

---

[1] For clarity, any reference hereinafter to J.M.T.R. is to the child, and we will refrain from using Mother's initials.

[2] By separate decrees entered the same date, the court additionally involuntarily terminated the parental rights of the Children's father, W.E.T.G. ("Father").  Father did not appeal or participate in the instant appeals.  We refer to Mother and Father collectively as "Parents."

that, earlier that month, Father killed their maternal grandmother in the family home while the Children were present. Father was charged with multiple misdemeanors and felonies, including, *inter alia*, criminal homicide, which remained pending. **See** Orders of Adjudication and Disposition, 7/6/23, at 1. Following an interview with the District Attorney's Office, Mother was arrested later in June 2023, and charged with felonies, including "criminal homicide (F1) and conspiracy - criminal homicide (F2)," which also remained pending. **See id**. Parents were denied bail and remained incarcerated while awaiting trial. **See id**.; **see also** N.T., 12/4/24, at 78-79, 97. The Children were placed together in foster care. **See** N.T., 12/4/24, at 86.[3]

In July 2023, the trial court adjudicated the Children dependent. The court maintained the Agency's custody of the Children and the Children's placement in foster care. The court further established permanency goals of return to a parent or guardian with concurrent goal of adoption. In addition, the court sustained the suspension of Parents' visitation. **See** Orders of Adjudication and Disposition, 7/6/24, at 4.

On July 3, 2024, the Agency filed petitions for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1),

_____

[3] Pursuant to the shelter care order of June 26, 2023, the court maintained the Agency's legal and physical custody of the Children and the Children's placement in foster care. The court further suspended any visitation of Parents "in light of the seriousness of the criminal charges and the traumatic effect" on the Children. Shelter Care Order, 6/27/23, at 2.

(2), (5), (8), and (b), as well as petitions to change the Children's permanency goals from reunification to adoption. The trial court conducted a combined evidentiary hearing on the Agency's petitions on December 4, 2024. Mother was present and represented by counsel. The Children, then nearly three and seven years old, respectively, were represented by a guardian *ad litem* and separate legal counsel.[4], [5] At the time of the hearing, the Children were still in their initial pre-adoptive, foster care placement. **See** N.T., 12/4/24, at 82, 86.

At the request of the Agency, and without objection, the trial court incorporated the records from the dependency proceedings and took judicial notice of the relevant criminal dockets. **See** N.T., 12/4/24, at 5-6. Further, the Agency presented the testimony of Alyssa Ott ("Ms. Ott"), who was stipulated to be an expert in the field of licensed clinical social work, as well as the Agency casework supervisor and current caseworker, Amanda Wilt ("Ms. Wilt"). Mother testified on her own behalf. The court additionally heard

_____

[4] As the court appointed separate counsel to represent the Children's legal interests, the court complied with 23 Pa.C.S.A. § 2313(a), as interpreted by the High Court. **See *In re Adoption of L.B.M.***, 161 A.3d 172, 180 (Pa. 2017) (footnote omitted).

[5] The record indicates that a Spanish interpreter provided interpretation services to Father, who was also present and represented by counsel. There is no indication that Mother received and/or required any such services. **See** N.T., 12/4/24, at 19.

from the Children's court-appointed special advocate ("CASA"), Patti Merrill ("Ms. Merrill").

In June 2023, at the time of their maternal grandmother's murder and their placement shortly thereafter, C.J.T.R. and J.M.T.R. were less than one and five years old, respectively. J.M.T.R. commenced therapy in August 2023 with Ms. Ott and remained in therapy at the time of the subject hearing. *See id*. at 13, 46, 78. Although C.J.T.R. had recently been attending J.M.T.R.'s therapy sessions, allowing for some observation, she was not yet receiving therapeutic services due to her young age. *See id*. at 13, 21, 44-46. According to J.M.T.R.'s treating therapist, Ms. Ott, J.M.T.R. was diagnosed as suffering from something "between" an acute stress disorder and post-traumatic stress disorder ("PTSD"), as well as adjustment disorder with anxious distress, as a result of the trauma incurred from the circumstances surrounding her maternal grandmother's murder. *See id*. at 30-31.[6]

At the time of the initiation of therapy, Ms. Ott described J.M.T.R. as being in "total freeze mode." *Id*. at 26. Ms. Ott recounted that J.M.T.R. "was having nightmares, sleep issues, she wouldn't talk, very much shut down, . . . a lot of fear, a lot of fear that people were watching her, a lot [of] fear that

---

[6] While C.J.T.R. accompanied J.M.T.R. to her recent therapy sessions, as noted above, C.J.T.R. was not yet a therapeutic client. *See* N.T., 12/4/24, at 13, 21, 44-46. Mother however testified that following the maternal grandmother's death, and prior to her incarceration, she had taken the Children for an intake appointment for grief counseling. *See id*. at 102-03.

people were gonna [sic] get her, a lot of fear." *Id*. at 27. Specifically, Ms. Ott testified that J.M.T.R. suffered "trauma as it relates to complicated grief" with her maternal grandmother. *Id*. at 31. She explained, "The grief of her grandmother is being translated more into a fear of what if that happens to me. So[,] it's more of . . . a complicated grief." *Id*. at 32-33. Ms. Ott stated,

> [J.M.T.R.] knows that there was something that happened, [Mother] and [Father] got upset. She believes that [Father] got upset because [her maternal grandmother] was not doing what she needed to, to -- I believe it was clean the house . . . .
>
> [J.M.T.R.] heard doors slamming. She does not remember anything after that. My clinical opinion . . . is that there was likely a lot of dissociation that happened within that period, because she loses that.[7]

*Id*. at 33-34 (some brackets in original).

Additionally, Mother recounted that C.J.T.R. received early intervention and physical therapy services related to delays with crawling and walking. *See id*. at 101-02. The Agency confirmed that C.J.T.R. was still receiving early intervention services due to "some developmental delays" at the time of the subject hearing. *See id*. at 81-82.

Agency caseworker Ms. Wilt testified that Mother is not in a position to obtain custody of the Children. *See id*. at 78, 80. She additionally testified that, even upon Mother's eventual release from incarceration, which is

---

[7] Ms. Ott explained that dissociation is a "trauma response" which serves as a "protective factor" whereby "you go inside yourself and it's shut off." *Id*. at 35.

unknown due to the unresolved nature of the criminal charges, reunification with the Children could take a "substantial amount of time." *Id*. at 87. She acknowledged that Mother completed various parenting and faith-based programs during her incarceration. *See id*. at 72-73. However, Ms. Wilt explained that Mother "would need to seek out-patient mental health treatment; depending on the outcome of the charges, either non-offending parent evaluation and treatment or offending parent evaluation and treatment; [and] therapeutic visitation once [J.M.T.R.'s] therapist would agree [to] what that would look like." *Id*. at 87 (some brackets in original). Specifically, inasmuch as Mother reported that she "suffers from . . . depression and anxiety," Ms. Wilt testified that Mother would need to be assessed for "ongoing mental health treatment . . . outside of incarceration." *Id*. at 90.[8]

Additionally, Ms. Ott opined that J.M.T.R. would not have, until about fourteen years old, the cognitive abilities to be able to determine, and then communicate, whether she wants to have contact with her parents. *See id*. at 64-67. Significantly, as a result, Mother's visitation with the Children had been suspended since the Children's placement in June 2023. *See* N.T.,

---

[8] Indeed, Mother conceded that any potential reunification would take time. She stated, "I'm asking if I could get some time, and with due time, I could get the help that I need and the help the girls need. . . ." N.T., 12/24/24, at 105.

12/4/24, at 73. Ms. Wilt reported that neither child requested nor inquired as to visitation with Mother. *See* N.T., 12/4/24, at 74.

As to C.J.T.R., who was nearly three years old at the time of the subject hearing, given her young age at the time of placement, Ms. Wilt testified that C.J.T.R. "wouldn't even recognize" Mother. *Id*. at 74, 76, 92. Ms. Wilt therefore opined that C.J.T.R. shares no bond with Mother. *See id*. at 76.

With respect to J.M.T.R., who was seven years old at the time of the subject hearing, Ms. Ott testified unequivocally that J.M.T.R. did not want to see or speak with Mother, whom she referred to as "old mom." *See id*. at 15, 17-19, 42-43, 49. Consistent with J.M.T.R.'s wishes, Ms. Ott recommended the child have no contact with Mother, stating that such contact would be "detrimental" to J.M.T.R. and "would cause an increase in dysregulation and would be high risk for set[] backs developmentally and emotionally." N.T., 12/4/24, at 59-60. Ms. Ott opined that, if J.M.T.R. has contact with Mother, she

> will revert back [] to some of your more classic symptoms of PTSD, definitely the nightmares, the isolation, she's not going to speak, she's not going to talk, she's going to be jumpy. I think you're going to see a lot of clinginess and distrust in the adults around her.
>
> I think at this point you would also see a lot of aggression.

N.T., 12/4/24, at 16; *see also id*. at 41-42.

In contrast, Ms. Ott observed an attachment between J.M.T.R. and her pre-adoptive foster parents, with whom the Children had been placed since

removal and whom J.M.T.R. referred to as "mom and dad." *See id*. at 20, 42, 82, 86. Despite describing such attachment as an "anxious attachment," Ms. Ott explained this attachment will become more secure with time. *See id*. at 20, 42. She further opined that J.M.T.R.'s "stronger bond lies 100 percent with the resource family, very much." *See id*. at 21-22. Ms. Ott further attributed J.M.T.R.'s therapeutic progress in part to her foster parents, in particular her foster mother and her consistency with J.M.T.R. *See id*. at 20-21, 27-28. Additionally, in order for J.M.T.R. to achieve "short-term and long-term emotional and developmental progress," Ms. Ott testified that J.M.T.R. needs to remain with her foster parents absent contact with Mother. *Id*. at 59-60. Overall, Ms. Ott acknowledged that J.M.T.R.'s progress in therapy would be negatively impacted if Mother's parental rights are not terminated. *See id*. at 55-56.

Similarly, Ms. Wilt testified that she observed "typical child-parent interactions" between the Children and their foster parents. *Id*. at 75, 82. She stated that the Children look to their foster parents for direction, comfort, and affection. *See id*. at 75. As a result, she opined that the foster parents meet the Children's emotional, medical, and basic needs, and the Children view them as parental figures. *See id*. at 76, 85-86.

Because it would be entirely speculative when and if Mother will be in a position to care for the Children, Ms. Wilt opined that it is in the Children's best interests to terminate Mother's parental rights. She reasoned, "[T]he

[C]hildren have remained in foster care and in [the Agency's] legal custody for 16 months, give or take, and we have no end in sight of [Mother] resolving [her] criminal matter, being released, and then working towards appropriate reunification services." *Id*. at 83-84.

Following the conclusion of the hearing, the trial court entered decrees involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). By separate orders, the court changed the Children's permanency goals from reunification to adoption with a concurrent goal of placement with a legal custodian (non-relative). Mother filed timely notices of appeal, and both she and the trial court complied with Pa.R.A.P. 1925.

On appeal, Mother raises the following issues for our review:

1. Did the [trial c]ourt abuse its discretion and err as a matter of law and/or abuse its discretion in finding that the Agency met its burden to terminate Mother's parental rights under 23 Pa.C.S.A. [§] 2511(a)(1), (2), (5), (8)[,] and [](b)?

2. Did the [trial c]ourt abuse its discretion and/or err as a matter of law in changing the primary goal from reunification to adoption?

Mother's Brief at 6.[9]

_____

[9] Legal counsel for the Children filed a brief with this Court in support of termination of parental rights and a change of the Children's permanency goals. Likewise, the guardian *ad litem* for the Children joined in the Agency's brief in support of termination and goal change.

Our standard of review is for an error of law or abuse of discretion: "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).[10] Thus, we must consider whether the trial court's order is supported by competent evidence. *See In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). Appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *See Interest of S.K.L.R.*, 256 A.3d at 1123.

Pennsylvania's Adoption Act ("the Act") governs involuntary termination of parental rights proceedings. *See* 23 Pa.C.S.A. §§ 2101-2938. Subsection 2511(a) provides grounds for the involuntary termination of parental rights. If the trial court finds clear and convincing evidence supporting the existence of one of the grounds for termination set forth in subsection (a), the court must then consider whether termination would best serve the child under subsection (b). *See id*. § 2511(b). This Court need only agree with one of the grounds set forth in subsection (a) to affirm, provided subsection (b) is

---

[10] "An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion," or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *See Interest of S.K.L.R.*, 256 A.3d 1108, 1123-24 (Pa. 2021).

also satisfied. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Accordingly, we analyze the decrees involuntarily terminating Mother's parental rights to Children pursuant to section 2511(a)(2) and (b) which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \* \* \* \*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> \* \* \* \*
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

To prove the applicability of section 2511(a)(2), the party petitioning for termination must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3)

that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***See In re Adoption of A.H.***, 247 A.3d 439, 443 (Pa. Super. 2021) (internal citation omitted). Grounds for termination pursuant to section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." ***Id***. (internal citation omitted).

We have long recognized that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." ***Id***. (internal citation omitted). While a parent's incarceration is not automatically dispositive with respect to termination, it is a relevant and potentially determinative factor to consider pursuant to section 2511(a)(2). Specifically,

> incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under [section] 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

***In re Adoption of S.P.***, 47 A.3d 817, 828 (Pa. 2012). The ***S.P.*** Court further stated:

> [W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S.[A.] § 2511(a)(2). . . ..

***Id***. at 830.

Mother acknowledges that she had been incarcerated for eighteen months at the time of the termination hearing, yet she argues that she appropriately provided for the Children prior to such time. *See* Mother's Brief at 21-22. She further maintains her innocence and asserts her right to defend herself. *See id*. at 22. Despite recognizing that the Children cannot and should not "remain in limbo for an extended period of time," she denies any reason to proceed with termination. *Id*.

In involuntarily terminating Mother's parental rights pursuant to section 2511(a)(2), the trial court emphasized, *inter alia*, Mother's continued incarceration on pending felony charges for homicide and her resulting inability to assume care and custody of the Children. *See* Order, 1/3/25, at 4, 6.[11] Moreover, the court noted several attendant circumstances of Mother's incarceration affecting her parental care and control of the Children, such as her inability to obtain appropriate housing; to pursue lawful income; and to engage in parental duties (excepting letter-writing which Mother testified she regularly engages in). *See id*. at 13-14. While the court additionally commended Mother for her participation in numerous prison programs, the court emphasized the unknown impact of these programs on her ability to appropriately parent. *See id*.

---

[11] While the trial court filed decrees involuntarily terminating Mother's parental rights on December 5, 2024, it issued its findings of fact and conclusions of law at the end of the termination hearing, which it later filed at a separate "order" on January 3, 2025.

Based on our review, we discern no abuse of discretion or error of law. The record supports the trial court's finding that there were grounds for termination under section 2511(a)(2). It is undisputed that Mother has been incarcerated since June 2023, stemming from charges related to the alleged murder of the Children's maternal grandmother in the family home, which is the same reason for the Children's removal. *See* N.T., 12/4/24, at 72-73, 78-79, 97.[12] These charges remained pending at the time of the termination hearing. *See id*. at 97, 105-06.[13] Accordingly, as Ms. Wilt testified, Mother is not in a position to obtain custody of the Children. *See id*. at 78, 80. Further, even if Mother were released from prison, reunification with the Children would take a substantial amount of time—notwithstanding Mother's completion of parenting and faith-based programs during her incarceration—because Mother would need to seek out mental health treatment for depression and anxiety, in addition to a parent evaluation and treatment, and, thereafter, therapeutic visitation with J.M.T.R. *See id*. at 72-73, 87, 90, 105. We reemphasize that J.M.T.R. would require several years to develop the

---

[12] *Accord In re Z.P.*, 994 A.2d 1108, 1120 (Pa. Super. 2010) ("The cause of incarceration may be particularly relevant to the Section 2511(a) analysis, where imprisonment arises as a direct result of the parent's actions which were part of the original reasons for the removal of the child.") (internal citation and internal quotations marks omitted)

[13] While the record reflects that a status hearing in Mother's criminal matter was to be held on February 25, 2025, the disposition of this hearing is unknown. *See* N.T., 12/4/24, at 97, 106.

"tools, the cognitive abilities, and the healthier ego-functioning" to decide, without guilt, whether to see Mother. *See id*. at 64-67.

Based on the foregoing, we discern no abuse of discretion by the trial court in concluding that termination pursuant to section 2511(a)(2) is warranted. The record demonstrates that Mother's repeated and continued incapacity due to ongoing incarceration has caused the Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being. Further, the conditions and causes of Mother's incapacity cannot be remedied. *See A.H.*, 247 A.3d at 443; *see also S.P.*, 47 A.3d at 830.

We turn next to the trial court's determination that termination of Mother's parental rights to the Children was in their best interests pursuant to section 2511(b). Section 2511(b) gives "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). *See also In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). We remain mindful that "the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis," with an eye towards "each child's specific needs." *Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023). This inquiry is neither formulaic, nor mechanical. *See id*. Our Supreme Court has elaborated:

> . . . [T]he child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The court

- 16 -

must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d at 1106 (internal citations, quotations, and footnotes omitted). Bond, permanency, stability, and all other intangibles are "all of 'primary' importance in the [s]ection 2511(b) analysis." *Id*. at 1109. In considering the affection which a child may have for his or her natural parents, this Court has stated that the affection a child harbors for parents does not necessarily constitute a bond, nor is a biological connection sufficient to establish that a bond exists. *See In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008). Further, this Court has clarified that it is "within the discretion of the [trial] court to prioritize the safety and security" of children "over their bonds with their parents[.]" *Interest of M.E.*, 283 A.3d 820, 839 (Pa. Super. 2022). Thus, we will not disturb such an assessment if the trial court's factual findings are supported by the record. *See id*.

Mother argues termination of her parental rights was not in the Children's best interests. Specifically, she maintains that C.J.T.R. did not suffer any trauma related to the death of the maternal grandmother. *See* Mother's Brief at 29. Conversely, while acknowledging that J.M.T.R. did suffer trauma, Mother asserts that, nonetheless, the trial court "rushed" to termination. *See id*. at 29.

In concluding that the Children's developmental, physical and emotional needs and welfare supported termination of Mother's parental rights, the trial

found that the Children suffered trauma surrounding their maternal grandmother's death. The court stated, "[W]hile in the care of [M]other and [F]ather, both children, and especially . . . [J.M.T.R.], were subjected to traumatic events that have necessitated extensive and ongoing therapeutic intervention for [J.M.T.R.] to ensure her long-term mental health well-being." Order, 1/3/25, at 7 (some brackets in original). Relying on the testimony of J.M.T.R.'s therapist, Ms. Ott, the court further concluded that "[C.J.T.R.] is going to [eventually] need mental health treatment and assistance going forward as she ages and is in a position to be able to participate effectively in such treatment." *Id*. at 12 (some brackets in original). As a result, the court ultimately determined "further contact between [M]other . . . in the even extended foreseeable future with either child will clearly not be in the [C]hildren's best interest[s] and will be detrimental to their mental health well-being in the short-term and long-term." *Id*. at 13. The court further emphasized that a parental bond existed between the Children and their foster parents. *See id*. at 17-19.

Following our review, we conclude the trial court's determination that termination of Mother's parental rights was supported by the record and law. The testimony by Mses. Wilt and Ott establishes that Mother and the Children do not share a necessary and beneficial relationship pursuant to section 2511(b). Rather, the Children share a beneficial relationship with their foster parents, and, additionally, J.M.T.R. would be detrimentally affected if Mother's

parental rights were not terminated. *See* N.T., 12/4/24, at 74, 76, 92 (Ms. Wilt opining that C.J.T.R. would not recognize Mother); *id*. at 74 (testimony by Ms. Wilt that neither child requested or asked about visiting Mother); *id*. at 15, 17-19, 42-43, 49 (Ms. Ott testifying that J.M.T.R. affirmatively does not want to see Mother, whom she refers to as "old mom"); *id*. at 16, 41-42 (Ms. Ott opining that contact with Mother would exacerbate J.M.T.R.'s PTSD); *id*. at 76, 85-86) (Ms. Wilt opining that foster parents meet the Children's emotional, medical, and basic needs, and the Children view the foster parents as parental figures). Thus, we discern no abuse of discretion or error of law in the trial court's determination that Mother's parental rights will serve the Children's developmental, physical, and emotional needs pursuant to section 2511(b).

With respect to Mother's appeals from the goal change orders, given our disposition concerning termination, Mother's appeals are moot. *See Interest of A.M.*, 256 A.3d 1263, 1272-73 (Pa. Super. 2021) (finding issues regarding goal change moot in light of termination of parental rights).

Accordingly, we affirm the decrees involuntarily terminating Mother's parental rights pursuant to section 2511(a)(2) and (b). Further, we dismiss Mother's appeals from the goal change orders as moot.

Decrees affirmed. Mother's appeals from the goal change orders dismissed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 05/13/2025